UNITED STATES of America, Plaintiff,

v.

NORTHERNAIRE PLATING CO., Willard S. Garwood and R.W. Meyer, Inc., Defendants and Third–Party Plaintiffs,

v.

CITY OF CADILLAC, Third–Party Defendant and Fourth–Party Plaintiff,

v.

R.W. MEYER, Jr., R.W. Meyer Sr., Individually and d/b/a R.W. Meyer Construction Company, Fourth–Party Defendants.

No. G84–1113 CA7.

United States District Court, W.D. Michigan, S.D.

May 6, 1988.

Robert H. Oakley, Asst. Atty. Gen., Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Thomas J. Gezon, Asst. U.S. Atty., Grand Rapids, Mich., Joel M. Gross, Land and National Resources Div., Environmental Enforcement Section, U.S. Dept. of Justice, Washington, D.C., Babette J. Neuberger, Asst. Regional Counsel, U.S. Environmental Protection Agency, Chicago, Ill., for plaintiff.

Smith Haughey, Rice & Roegge by L. Roland Roegge, John M. Kruis, Grand Rapids, Mich., for defendant R.W. Meyer Inc.

Cholette, Perkins & Buchanan by Michael P. McCasey, Miles J. Murphy, Grand Rapids, Mich., Susan E. Morrison of Siudara, Rentrop, Martin & Morrison, Bloomfield Hills, Mich., for Northernaire Plating and Willard S. Garwood.

Owen J. Cummings of Cummings, McClorey, Davis & Acho, P.C., Livonia, Mich., for third party defendant and the City of Cadillac; Robert P. Tremp, Traverse City, Mich., of counsel.

HILLMAN, Chief Judge.

The facts of this case are detailed in *United States v. Northernaire Plating Co.*, 670 F.Supp. 742 (W.D. Mich.1987). In that opinion, this court found the original defendants Willard Garwood, Northernaire Plating Co. ("Northernaire"), and R.W. Meyer, Inc. ("Meyer") jointly and severally liable to plaintiff for the cost of removing hazardous substances from a site in northern Michigan under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (hereinafter "CERCLA" or ("the Act"). 42 U.S.C. § 9607(a). Presently before the court are plaintiff's motion for summary judgment on costs and plaintiff's motion to strike jury demand.

## I. *Plaintiff's Motion to Strike Jury Demand*

█ Defendant Meyer filed a jury demand along with its answer to plaintiff's complaint. Plaintiff's action for recovery under CERCLA is an equitable action, seeking "restitution or reimbursement of the costs it expended in order to respond to the health and environmental danger presented by hazardous substances." *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 749 (8th Cir.1986) (hereinafter *"NEPACCO"*), *cert. denied,* —— U.S. ——, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988). Defendant does not have a right to a jury trial of plaintiff's claim for equitable relief. *NEPACCO, supra; see also Tull v. United States,* —— U.S. ——, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987) (discussing absence of right to jury trial in equitable actions). Therefore, plaintiff's motion to strike jury demand, to which defendant Meyer has never responded, is granted.

## II. *Plaintiff's Motion for Summary Judgment on Costs*

CERCLA authorizes the EPA "to take direct 'response' actions which can include either short-term 'removal' actions or long-term 'remedial' actions or both, pursuant to the [national contingency plan], with funds from the 'Superfund,' and to seek recovery of response costs from responsible parties pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607, in order to replenish the Superfund." *NEPACCO,* 810 F.2d at 731 (footnote omitted). Although this court has already determined that defendants Garwood, Northernaire, and Meyer are liable to the United States for its costs incurred relating to the removal action at the Northernaire site, the court now must determine how much defendants must pay. Prior to 1986, 42 U.S.C. § 9607(a)(4) provided:

> [A]ny person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
>
> (A) all costs of removal or remedial action incurred by the United States Government or a state not inconsistent with the national contingency plan;
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
>
> . . . .

Plaintiff, seeking to resolve the question of how much is owed without trial, has submitted documentary evidence which, plaintiff argues, demonstrates that defendants owe plaintiff $234,337.97 in costs incurred by the Environmental Protection Agency ("EPA"), $60,621.99 in prejudgment interest on those EPA costs, and $35,473.28 in costs incurred by the Department of Justice. The most recent cost summary submitted by the plaintiff breaks down the EPA costs as follows: $22,241.69 for EPA payroll; $5,974.70 for EPA travel; $11,641.08 for a contract with "Weston"; $140,419.00 for a contract with "Petrochem"; $993.00 for a contract with "GCA"; $90.00 in miscellaneous expense to "Weston"; and $52,978.50 "indirect cost." [1]

Defendants Meyer, Northernaire, and Garwood have filed two briefs in opposition to plaintiff's motion for summary judgment on costs. Defendants raise three reasons which they argue preclude this court from granting plaintiff's motion: 1) plaintiff's

---

**1.** Plaintiff's motion originally requested $22,113 in payroll expenses, $53,397 in indirect costs, and $6,825 in travel costs. Plaintiff later modified these requests according to the documents and affidavits filed with the court. In addition, plaintiff supplemented its original request for "prejudgment interest at a rate to be determined later," with a request for the specific amount of interest noted above, $60,621.99. This $60,622 in interest is calculated for the EPA costs alone. Because plaintiff's motion sought interest on all costs, including those incurred by the Department of Justice, the court assumes that by subsequently specifying the amount of interest on the EPA costs, plaintiff is not thereby withdrawing its request for prejudgment interest on non-EPA costs.

costs were inconsistent with the national contingency plan ("NCP") because plaintiff failed to collect and maintain sufficient documentation of costs and because plaintiff's expenses were not cost-effective; 2) genuine issues of fact remain concerning whether or not certain costs were actually incurred; and 3) plaintiff is not entitled to recover "indirect costs" or prejudgment interest under Section 9607.

### A. Standard for Summary Judgment

Plaintiff's motion for summary judgment is governed by Federal Rule of Civil Procedure 56. Plaintiff, as movant, carries the burden of demonstrating that no genuine issue of material fact remains and that it is entitled to judgment as a matter of law. Under Rule 56(e), however, defendants may not rest on their pleadings, but must set forth specific facts showing that there is a genuine issue for trial. The standard under Rule 56 mirrors the standard for directed verdict: "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed. 2d 202 (1986). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences from the record in favor of the party or parties opposing the motion, in this case, defendants. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *Smith v. Hudson*, 600 F.2d 60, 64 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

■ Defendants Garwood and Northernaire request the court deny summary judgment until "further information is obtained" about costs. Specifically, defendants state they wish to engage in further depositions to obtain facts to oppose plaintiff's motion. Before deciding a motion for summary judgment, this court "must provide both parties an opportunity to conduct some discovery." *Vega v. First Federal Savings & Loan Assn. of Detroit*, 622 F.2d 918, 926 (6th Cir.1980); *Bilderback v. City Natl. Bank & Trust Co.*, 639 F.2d 331, 332 (6th Cir.1981). In *Vega*, the Sixth Circuit

reversed an entry of summary judgment involving costs, stating that the "opportunity for discovery is even more critical in cases ... where [one party] possesses all of the relevant information. Only through discovery can it be determined whether a material factual issue exists which precludes summary judgment." *Id.*

Here, as in *Vega*, one party, plaintiff, possesses most, if not all of the information concerning its costs. However, unlike *Vega*, there are no discovery disputes pending in this case, nor have defendants been "denied the opportunity to pursue relevant avenues of conquiry concerning the ... costs...." *Id.* This case was filed in September of 1984, three and one-half years ago. Nearly a year has passed since this court found defendants liable, and over seven months have passed since plaintiff filed its motion for summary judgment on costs. It appears from the record that since that time some discovery has taken place concerning the cost issue. Defendants have had an adequate opportunity to depose those people whom they wished to depose. *See also United States v. South Carolina Recycling & Disposal, Inc.*, 653 F.Supp. 984, 1007–08 (D.S.C.1984) (hereinafter "*SCRDI*") (United States' motion for summary judgment on costs granted when supported by cost summaries and affidavits as here, and defendants given approximately three months for discovery of cost information).

Moreover, defendants have not moved for a continuance under Fed.R.Civ.P. 56(f). Rule 56(f) authorizes a court to order a continuance to permit further discovery rather than grant a motion for summary judgment, if it appears from the opponents' affidavits that they cannot present facts essential to justify their opposition. Defendants have not filed any affidavits suggesting they are unable to present essential facts. *See Anchor Motor Freight v. International Brotherhood of Teamsters*, 700 F.2d 1067, 1071 (6th Cir.), *cert. denied*, 464 U.S. 819, 104 S.Ct. 81, 78 L.Ed.2d 92 (1983). Plaintiff's summary judgment motion on costs is ripe for consideration and is an appropriate method to resolve the pend-

ing cost issues in this case. *SCRDI*, 635 F.Supp. at 1006–07.

#### B. *Consistency with the NCP*

■ Under 42 U.S.C. § 9607(a)(4), the United States may recover costs "not inconsistent with the national contingency plan." The NCP is described in 42 U.S.C. § 9605 and promulgated in 40 C.F.R. §§ 300.1–.86 (1987). While a defendant in a CERCLA action may raise inconsistency with the NCP as a defense to an action for costs, *United States v. Outboard Marine Corp.*, 789 F.2d 497 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986), the defendant carries the burden of showing the costs sought under Section 9607 are inconsistent with the plan. *NEPACCO*, 810 F.2d at 747–48.

#### 1. *Compliance with 40 C.F.R. 300.69*

■ Defendants raise two different issues of non-compliance with the NCP. First, defendants Northernaire and Garwood claim that plaintiff failed to collect and maintain sufficient documentation supporting the costs as required by 40 C.F.R. § 300.69 (1987). This section of the NCP provides, in pertinent part:

> During all phases of response, documentation shall be collected and maintained to support all actions taken under this Plan, and to form the basis for cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the condition, the identity of responsible parties, accurate accounting of Federal or private party costs incurred, and impacts and potential impacts to the public health and welfare and the environment.

Defendants state that plaintiff has failed to present information concerning the availability of lower bids, and argue that the documents plaintiff produced during discovery concerning contract awards, cost summaries, and EPA payroll reports failed to "support all actions taken under this Plan."

In explaining what documentation is required, the regulation provides that the documentation be "sufficient to provide ... accurate accounting of Federal ... costs incurred." Plaintiff has submitted docu-

mentation detailing the source and computation of each cost item requested. Defendant Meyer has submitted even more government documents concerning costs, presumably obtained from plaintiff. I conclude that defendants Garwood and Northernaire have not shown plaintiff's actions were inconsistent with 40 C.F.R. § 300.69.

#### 2. *Compliance with 40 C.F.R. § 300.68*

■ Second, defendants protest the failure of plaintiff to take cost-effective remedial action. Section 9605(7) of CERCLA provides that the NCP shall include "means of assuring that remedial action measures are cost-effective over the period of potential exposure to the hazardous substance or contaminated materials...." The term "cost-effective" was defined in the NCP during 1983 to 1985 to be "the lowest cost alternative that is technologically feasible and reliable and which effectively mitigates and minimizes damage to and provides adequate protection of public health, welfare, or the environment." 40 C.F.R. § 300.68(j)(1985); *NEPACCO*, 810 F.2d at 748. A defendant may meet the burden of showing that an expense is too costly to be consistent with the NCP only by demonstrating that the agency's decision to incur that cost was arbitrary and capricious. *NEPACCO*, 810 F.2d at 748. The deference with which courts review such decisions recognizes that "determining the appropriate removal and remedial action involves specialized knowledge and expertise," *id.*, consideration of "numerous scientific factors," and balancing "cost with feasibility and adequacy of remedy." *United States v. Ward*, 618 F.Supp. 884, 900 (D.N.C.1985); *see also,* 42 U.S.C.A. § 9613(j) (West Supp.1987) (1986 amendment stating decision in selecting response action will be upheld unless objecting party can demonstrate the decision was arbitrary and capricious or not in accordance with law); House Reports No. 99–253 (III and V) on the Superfund Amendments of 1986, *reprinted in* 1986 *United States Code Congressional and Administrative News* 2835, 3047–48, 3149.

■ With these standards in mind, the court will address each action that defend-

ant argues was not cost-effective. First, defendant argues that plaintiff's decision to award the cleanup up contract to Petrochem Services, Inc., ("Petrochem") without competitive bidding was "arbitrary and capricious" and not cost-effective. At the time the United States contracted with Petrochem for the cleanup of the Northernaire site, federal law provided that "[a]ll ... contracts for property and services shall be made by advertising, as provided in section 303 [41 U.S.C. § 253], except that such purchases and contracts may be negotiated by the agency head without advertising if—... the public exigency will not admit of the delay incident to advertising...." 41 U.S.C. § 252(c) (1974), *amended by* 41 U.S.C.A. § 252 (West Supp. 1987). Both parties agree that plaintiff awarded a contract to Petrochem without advertising. The EPA found that "the release of .. hazardous substance(s) presents an imminent and substantial threat to the public health and welfare," and that formal advertising "could delay the emergency response action necessary to remove the hazardous substance(s) or to prevent the release of such substance(s) which, upon exposure, may cause death, disease, or illness."

Meyer argues that this finding is inaccurate, that there was no imminent or substantial threat to the public health or welfare which would require abandonment of the formal bidding process. Meyer refers to the July 1982 memo of Robert Bowden, Chief of the Spill Response Section of the EPA, in which Bowden states that there is no emergency at the Northernaire site, a March 1983 memo from the on-scene coordinator George Madany, stating that no immediate removal is warranted, and an April 1983 report which also states that the site was not an immediate threat to human health or the environment and the cleanup operations could wait six months. Meyer charges that the EPA could have started the bidding process in 1982, and, alternatively, that no emergency existed in 1983 which required circumvention of advertising requirements.

Robert Bowden, Chief of the Spill Response Section of the EPA, explains in his second affidavit that the process of award-ing a contract through competitive bidding is very time consuming, taking, normally, nine to twelve months. The March 1983 memo on which defendants rely also stated that the "tanks and drums" containing acids and cyanides "are badly rusted." Certain vats, the report concluded, "appeared capable of holding the contents for a few months longer." Mr. Bowden, in his affidavit, also states that "if the acids and cyanide came into contact, the resulting reaction would form hydrogen cyanide gas," which "could result in severe injury or even death to persons in the area." Defendants do not dispute these factual assertions.

Meyer and the government both rely on the same reports, memos, and letters to provide the factual basis for their conclusions. Rather than raising a genuine issue of fact, Meyer disputes the propriety of the agency's decision, a question of law to be decided by the court under an arbitrary and capricious standard. Given the risk of death or injury should the tanks leak, agreement by the authors of the March 1983 memo and the April 1983 report that removal action was needed within six months, and the nine to twelve month time period necessary to let the removal contract for competitive bidding, I conclude that the EPA did not act arbitrarily or capriciously by characterizing the site as imminently threatening or by choosing to by-pass competitive bidding.

Meyer charges that the "extremely high" amount that Petrochem billed the EPA per day "certainly creates a question of cost effectiveness." Defendant has not produced any evidence suggesting that plaintiff had a more cost effective alternative to the Petrochem contract. Defendant's conclusory allegations do not demonstrate plaintiff's decisions were arbitrary or capricious.

■ Meyer also challenges the $993 that the EPA paid GCA Corporation to perform a title search on the Northernaire property. Meyer submits a memo which disapproves a plan submitted by GCA to do the work for $2,289 and notes that the work could be done by the Wexford County abstract office at an estimated cost of $120.00. Both

parties agree that EPA went on to pay GCA $993 for the work. Meyer objects to reimbursing the government $993 for a job which the EPA had earlier acknowledged could have been finished for $120. Defendant's proof tends to show that an official at one time believed there was a cheaper alternative to GCA's first offer, and precludes summary judgment on this particular cost.

■■■ Defendant questions plaintiff's decision to send more than one attorney to proceedings on this case and more than one EPA employee to negotiations on the Northernaire site. Congress has provided that the plaintiff in a CERCLA action may recover "all costs" not inconsistent with the NCP. 42 U.S.C. § 9607. These costs include attorney's fees and reimbursement for costs incurred by the Department of Justice. *United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823, 851 (W.D.Mo.1984), *aff'd,* 810 F.2d 726 (1986), *cert. denied,* ── U.S. ──, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *SCRDI,* 653 F.Supp. at 1009. Costs that are not inconsistent with the NCP "are conclusively presumed to be reasonable." *NEPACCO,* 810 F.2d at 748. Agencies' choices concerning negotiation and litigation strategy do not involve the type of scientific and public health concerns involved in the choice of what removal action to take. Litigation and related activities, therefore, may not deserve the same deferential arbitrary and capricious review that is applied to the agencies' choice of cleanup remedy. However, in reviewing any agency response decision for cost effectiveness under the NCP, the burden remains on the defendant to show that the agencies' action was not cost effective. Merely raising the question of why more than one person attended certain proceedings does not meet this burden.

### C. *Factual Disputes over Certain Costs*

Defendant Meyer argues that the invoices from Petrochem total only $113,880.21, not the $140,419 billed. The cost summary for the Petrochem contract shows two invoices, No. 33313 for $136,285.87 and No. 33133 for $4,133.13. These invoices total

$140,419.00, the amount that Ms. Pipkin, a program analyst for the government, states in her affidavit was the total cost of the Petrochem contract. No evidence suggesting a lesser amount was actually paid or billed appears in the record. No genuine issue of fact remains regarding the amount plaintiff paid to Petrochem.

■■■ Defendant objects that plaintiff improperly allocated the total travel costs for Northernaire and another site to the Northernaire site alone. Defendant attached travel reports, vouchers, or authorizations for five trips: December 1982; February 1983; March 1983; April 3, 1984; and April 12, 1984. These documents show that each trip pertained to at least one other site in addition to the Northernaire site. In his affidavit submitted in response to Meyer's brief, Richard D. Hackley, an accountant with the EPA, states that only half of the expense of the December 1982 trip was attributed to Northernaire. Mr. Hackley states that cost of the April 3, 1984 trip has been deleted from the amount sought by the government. The cumulative summary of travel costs dated October 14, 1987, notes that only one-fourth of the March 1983 trip and only half of the April 12 trip were charged to the Northernaire site. Although Mr. Hackley does not specifically address the allocation of costs among sites for the February 1983 trip, he states in his second affidavit that he has again reviewed the cost data and believes that the cost data "represents a fully accurate statement of all costs through May 11, 1987 ..., associated with the Immediate Removal Action at the Northernaire site." Given this record, no genuine issue of fact remains concerning the propriety of plaintiff's allocation of travel costs.

■■■ Defendant objects to plaintiff's demand for $2,730 of its payroll expenses, incurred as late as two years after the removal action. These expenses are documented in exhibits attached to plaintiff's brief along with all other payroll expenses requested by plaintiff. Plaintiff represents that after the removal action, payroll expenses were incurred preparing for litigation and documenting costs. Defendant

has not presented any evidence from which a fact finder could infer that these payroll costs were not related to the removal action or were excessive or inconsistent with the NCP. In a CERCLA action, plaintiff is entitled to all recovery costs, including attorney fees and litigation expenses incurred by the staffs of the EPA and the Department of Justice. *United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F.Supp. 823 (W.D.Mo.1984), *aff'd*, 810 F.2d 726 (1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).

■ Defendants Northernaire and Garwood object to the $35,473 requested in Department of Justice costs. Defendants argue that the plaintiff has presented no evidence of, and the defendants have no way of verifying, specific Department of Justice expenses. In his affidavit, however, Philip Stinnes, Deputy Executive Assistant in the Executive Office of the Land and Natural Resources Division at the United States Department of Justice, explains that the Department's cost figure was calculated not by adding up each and every specific cost accumulated in litigating this case, but by figuring, on an annual basis, what portion of the Department's total costs were to be allocated to this case.

Mr. Stinnes states that the total amount charged to the Superfund account by the Lands Division of the Department is determined by multiplying each total Lands Division cost (printing, freight, etc.) by the ratio between the professional hours devoted to Superfund cases, including this case, and total Division professional hours. For the years in question here, this ratio of Superfund hours to total hours ranged from 19 to 27 percent. The portion of Lands Division costs allotted to Superfund cases were then charged to the Superfund account. To arrive at the Department's Superfund costs for this particular case, the Department then prorated the total Superfund costs by the percentage of professional hours actually spent on this case. The percentage of professional hours spent on the Northernaire case of all Superfund professional hours in the Lands Division ranged from .027 to .38 percent annually.

Thus, defendants' objection to lack of documentation for all $35,473.28 fails to raise a genuine issue of material fact necessitating trial. Defendants have not presented any evidence to this court that suggests that the Department's cost figure for this case, or the Department's method of computing that figure, is unreasonable or inaccurate.

### D. *Indirect Costs*

■ Defendant Meyer maintains that the EPA's "indirect costs" are not recoverable. Mr. Cook, cost accountant with the Superfund Accounting Branch of the EPA, stated in an affidavit that the EPA's "indirect costs" for this case, amounting to $52,978.50, "are costs which are necessary to the operation of the program and support of site clean up efforts, but which cannot be directly identified to the efforts of any one site." Mr. Cook likens indirect costs to "overhead costs," and states that they are "such things as rent and utilities for site and non-site staff office space; payroll and benefits for program managers, clerical support and other administrative support staff; and pay earned by on-scene coordinators while on leave, or performing tasks not directly associated with a particular site." These costs, he continues, are "generally understood and accepted within the business community, and are recognized as costs to the Agency in all government grants and contracts."

The total indirect cost figure sought here is the result of multiplying the number of EPA personnel hours charged to the site, by the cost rate for each specific year in that Region. In 1983, that rate was $72 per hour, in 1984 it was $61, in 1985 it was $53 and in 1986 it was $51 per hour. The plaintiff calculated indirect costs for 1987 and 1988 using a provisional rate of $51 per hour.

Under Section 9607, defendants are liable for "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the [NCP]." At the time of the removal action in this case, Section 9601(25) defined "response" as "remove, removal, remedy, and remedial ac-

tion." In 1986, Congress added the following clause to this definition: "all such terms (including the terms 'removal' and 'remedial action') *include enforcement activities related thereto.*" 42 U.S.C. § 9601(25) (emphasis added). Thus, in order to determine the recoverability of indirect costs, the court must decide whether Congress intended that Superfund's administration costs were costs of "removal or remedial action," or using the 1986 amendment as a guide, costs of "enforcement activities" "related" to the "removal" or remedial action in this case. The Act defines "Removal" to include

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release of threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, *action taken under section 9604(b) of this title,* and any emergency assistance which may be provided under the Disaster Relief Act....

42 U.S.C. § 9601(23) (emphasis added).

The activities authorized by Section 9604(b) include

> such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as [the President] may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

42 U.S.C. § 9604(b).

The term "remedy" or "remedial action" is defined to mean

> those actions consistent with permanent remedy taken instead of or in addition to

removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare....

Although these provisions read as if they pertain to a particular site and not to all sites generally, Congress clearly intended that the United States recover *all* of the costs incurred in a remedial or removal action. The language of Section 9604(b), combined with the broad remedial purpose of CERCLA, supports a liberal interpretation of recoverable costs. " 'Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.' " *Walls v. Waste Resource Corp.,* 823 F.2d 977, 980 (6th Cir.1987) (quoting *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1112 (D.Minn. 1982)). The Sixth Circuit has stated that it

" 'will not interpret Section 9607(a) in any way that apparently frustrates the statute's goals, in the absence of a specific congressional intention otherwise.' " *Id.* at 981 (quoting *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1045 (2d Cir.1985)).

The legislative history is silent, and the case law sparse on the precise issue of the recoverability of EPA's "indirect costs." In *SCRDI, supra,* the court granted "administrative, investigative, and legal expenses associated with the cleanup" and the "litigation." 653 F.Supp. at 1007–09 (D.S.C.1985) (awarding $1,065,910.92 in federal costs and $93,000 in state administrative expenses). In *United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823 (W.D.Mo.1984), *aff'd,* 810 F.2d 726, *cert. denied,* — U.S. —, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987), the court found defendants liable for "all costs, including salaries *and expenses,* incurred by plaintiff associated with such activities as monitoring, assessing and evaluating the release of contaminants and the taking of actions to prevent, minimize or mitigate damage which might result from a release of contaminants from the Denny farm site." *Id.* at 851–52 (emphasis added). Because neither the opinion in *NEPACCO,* nor the opinion in *SCRDI,* specify whether or not the costs granted included the type of "indirect costs" that the EPA seeks in this case, these cases do not provide specific guidance on the decision at issue in this case.

There is one very recent opinion on point, however. In *United States v. Ottati & Goss, Inc.,* No. C–80–225–L (D.N.H., slip op. March 17, 1988), the court prohibited recovery of $336,922 in EPA indirect costs, including expenses for rent, utilities, supplies, clerical staff, and other overhead expenses. The court found that the costs were "necessary to operate the Superfund program" but could not "be attributed directly to the O & G/GLCC sites." The *Ottati* court gave no further explanation for its decision to deny indirect costs.

Interpreting the statute's provisions, its legislative history, and the meager case authority on this issue, I conclude that Congress intended that the United States may recover the "indirect costs" under Section 9607. This portion of plaintiff's motion for summary judgment is granted.

### D. *Prejudgment Interest*

On October 17, 1986, six months before this court's opinion granting plaintiff summary judgment as to liability, Congress added the following language to the end of Section 9607(a)(4):

> The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26....

42 U.S.C.A § 9607(a)(4) (West Supp.1987).

In this case this court is bound by the amended provision, despite its enactment after much of the requested interest had accrued. *See Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Even interpreting 42 U.S.C. 9607(a) prior to the amendment, prejudgment interest would be appropriate. *United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823 (W.D.Mo.1984) (holding prejudgment interest recoverable), *aff'd,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *see also Walls v. Waste Resource Corp.,* 823 F.2d 977, 981 (6th Cir.1987) (stating that subsequent legislative history of CERCLA provides "useful guidance" to unsettled interpretation). In the absence of a statutory provision to the contrary, the award of prejudgment interest is a matter addressed to the discretion of the court. *Bricklayer's Pension Trust Fund v. Taiariol,* 671 F.2d 988 (6th Cir.1982). Congress intended CERCLA to provide a mechanism for recovery of *all* costs of removal actions from

those who are responsible. *See Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 6–7, 92 L.Ed. 3 (1947) (prejudgment interest for statutory obligation depends in part upon Congressional purpose in imposing obligation). Interest lost on monies expended from the Superfund was part of the cost to the government of removing hazardous substances from the Northernaire site.

Interpreting CERCLA to fulfill Congress' purpose of fully reimbursing the federal government for its clean up expenses, I conclude that prejudgment interest, like attorney's fees and the other costs discussed above, was recoverable even before the 1986 amendment, and is appropriate in this case. I am aware that other courts have denied prejudgment interest. See *SCRDI, supra; Ottati & Goss, supra.* However, I find that the intent of Congress was to grant such interest, and that prejudgment interest is necessary to fully compensate plaintiff for its clean up and enforcement efforts. *NEPACCO,* 579 F.Supp. at 852.

Section 9607 now provides that the rate of prejudgment interest payable is the same as the rate of interest on investments of the Hazardous Substance Superfund. In his affidavit, Mr. Hackley sets forth the interest rates on Superfund investments for each year from 1984 through 1987, which range from 5.63 to 10.82 percent. Even in the absence of the amendment, applying these rates makes sense if plaintiff is to be reimbursed for what it has actually expended. Section 9607 also provides that the interest shall accrue from the later of either the date payment of a specified amount is demanded in writing, or the date of the expenditure concerned. Here, plaintiff demanded reimbursement for some of its expenses on or about August 13, 1984. However, many of the costs recovered in this action were not actually incurred until after August 13, 1984. Therefore, although the court finds that plaintiff is entitled to reimbursement of $233,344.97 in EPA costs and $35,473.28 in Department of Justice costs, and although plaintiff is entitled to prejudgment interest on those costs at the annual rates set forth in Mr. Hackley's affidavit, plaintiff is not entitled to interest on the entire amount calculated from August 13, 1984. The court will delay ruling on the total amount of interest due plaintiff until the parties agree among themselves on an amount or, in the event no agreement is reached, supply the court with affidavits calculating the amount of interest due taking into account the date on which the expenditures occurred.

### III. *Conclusion*

Plaintiff's motion to strike jury demand is granted. No issue of material fact remains concerning all of the costs recoverable under 42 U.S.C. § 9607(a), except for the cost of the title search and the interest. Plaintiff's motion for summary judgment is denied as to the amount owed plaintiff for the title search and for prejudgment interest. The court will delay ruling on the title search cost and the total interest to be awarded pending submission of further affidavits.

### ORDER

In accordance with the opinion filed this date,

IT IS ORDERED that plaintiff's motion for summary judgment on costs is granted as to $268,818.25, consisting of all amounts sought except for interest and the $993.00 paid to GCA for the title search.

IT IS FURTHER ORDERED that defendant is liable for prejudgment interest on the $268,818.25, and that within 30 days of this order, the parties shall file with the court a stipulation as to the amount of interest owed under Section 9607(a). In the event agreement cannot be reached, plaintiff shall file an affidavit or affidavits setting forth the total amount of interest due under Section 9607(a), taking into account the date on which each expenditure occurred. The court's ruling on the amount of prejudgment interest to be awarded plaintiff will be held in abeyance pending receipt of this information.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment on defendant's liability for the $993 paid to GCA is denied.

IT IS FURTHER ORDERED that within 30 days of the filing of this order, the parties shall submit affidavits or other evidence concerning the title search expense so that the court may determine, without the expense of trial, whether plaintiff is entitled to judgment on this amount.

IT IS FURTHER ORDERED that plaintiff's motion to strike jury demand is granted.