Luis and Margaret VEGA, Individually and on behalf of others similarly situated, Plaintiffs-Appellants,

v.

FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF DETROIT, Defendant-Appellee.

No. 77-1552.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 29, 1979.

Decided May 27, 1980.

As Amended on Denial of Rehearing July 15, 1980.

David W. Sinclair, Anthony C. Lutostanski, Detroit, Mich., for plaintiffs-appellants.

David M. Hayes, Clark, Klein & Beaumont, William B. Dunn, Dennis G. Bonucchi, Detroit, Mich., for defendant-appellee.

Before LIVELY, BROWN and JONES, Circuit Judges.

BAILEY BROWN, Circuit Judge.

In 1975, Luis and Margaret Vega applied for and received a residential loan from the First Federal Savings and Loan Association of Detroit (First Federal). The Vegas subsequently brought this action alleging that First Federal, providing the loan, had violated numerous provisions of the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*, and the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.* The Honorable Damon J. Keith, then chief district judge, in a careful and full opinion, granted summary judgment in favor of First Federal. *Vega v. First Federal Savings and Loan Association,* 433 F.Supp. 624 (E.D.Mich. 1977). We affirm that decision in all respects except as to one issue, which is the last issue discussed in this opinion.

## I.

### The Truth in Lending Act

The Truth in Lending Act was enacted in the wake of consumers' increasing use of credit. Its purpose was to require creditors to disclose relevant information to consumers so that they could make informed decisions as to the use of credit. Rather than create detailed statutory disclosure requirements, Congress "delegated to the Federal Reserve Board broad authority to promulgate regulations necessary to render the Act effective." *Mourning v. Family Publications Service,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). In this manner, the Truth in Lending Act retains sufficient flexibility to adjust to new variations in credit plans. Thus, the regulations promulgated by the Federal Reserve Board as well as the statutory provisions of the Act establish the standard by which a creditor's disclosures must be measured.

The disclosure requirements applicable to a residential loan are set out in Section 129 of the Truth in Lending Act, 15 U.S.C. § 1639, and Section 226.8 of Regulation Z, 12 C.F.R. § 226.8. One of the items to be disclosed is the finance charge on the loan "expressed as an annual percentage rate." The term "finance charge" generally encompasses those charges "payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605. *See also* 12 C.F.R. § 226.4(a). In addition to the finance charge, a creditor must separately disclose "the default, delinquency, or similar charges payable in the event of late

payments." 15 U.S.C. § 1639(a)(7), 12 C.F.R. § 226.8(b)(4). A delinquency charge "is not a finance charge if imposed for actual unanticipated late payment, delinquency, default, or other such occurrence." 12 C.F.R. § 226.4(c). While the Truth in Lending Act mandates the disclosure of several other types of information, the basic issues in this case are limited to whether certain items constitute either a finance charge or a delinquency charge and are therefore required to be disclosed under the Truth in Lending Act.

### A. Acceleration clause

■ To obtain their residential loan, the Vegas signed both a promissory note and a mortgage. Both documents contained an acceleration clause allowing First Federal to demand the entire unpaid principal upon default. The disclosure statement received by the Vegas from First Federal did not reflect this power of acceleration.[1] The Vegas maintain that the acceleration clause or the effect of such clause should have been disclosed under 15 U.S.C. § 1639(a)(7) as a delinquency charge.

The proper treatment of acceleration clauses under the Truth in Lending Act has recently been resolved by the Supreme Court in *Ford Motor Credit Co. v. Milhollin*, —— U.S. ——, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). Prior to *Milhollin*, however, the issue was one of considerable confusion and conflict. Most of the courts had held that the mere right of acceleration was not a "charge" which must be disclosed. *See Ford Motor Credit Co. v. Milhollin, supra* at note 7. But courts have diverged in their treatment of whether the effect of an acceleration clause was required to be disclosed. *Compare United States v. One 1976 Chevrolet Station Wagon*, 585 F.2d 978 (10th Cir. 1978); *Griffith v. Superior Ford*, 577 F.2d 455 (8th Cir. 1978); *Begay v. Ziems Motor Co.*, 550 F.2d 1244 (10th Cir. 1977) *with Price v. Franklin Investment Company, Inc.*, 574 F.2d 594 (D.C. Cir. 1978); *McDaniel v. Fulton National Bank*, 571 F.2d 948

(5th Cir. 1978); *Johnson v. McCrackin-Sturman Ford, Inc.*, 527 F.2d 257 (3rd Cir. 1975) *with St. Germain v. Bank of Hawaii*, 573 F.2d 572 (9th Cir. 1977). In resolving this conflict, the Supreme Court deferred to the interpretations of the Act by the Federal Reserve Board and its staff. The Court emphasized that, in light of the Congressional delegation of authority to the Federal Reserve Board, such interpretations should be treated as dispositive unless "demonstrably irrational."

In considering the disclosure of acceleration clauses, the Board's staff has concluded that the mere right itself need not be disclosed. Official Staff Interpretation No. FC–0054. In addition, the staff has determined that the effect of an acceleration clause is only required to be disclosed in limited circumstances, specifically when the rebate of unearned interest upon acceleration is different from the rebate of unearned interest in other prepayment situations. Accordingly, as long as the rebate practices upon acceleration and other prepayment situations do not differ, and as long as the rebate of unearned interest in such prepayment situations is disclosed pursuant to 12 C.F.R. § 226.8(b)(7), separate disclosure of the acceleration rebate practice is not required. *See Ford Motor Credit Co. v. Milhollin, supra* at note 8. In *Milhollin*, the Supreme Court found this interpretation of the requirements of the Act was a reasonable one and therefore deemed it to be controlling.

That same interpretation is controlling in this case. Under the staff interpretation First Federal was not required to disclose the right of acceleration. Nor was it required to disclose the effect of the acceleration clause. The disclosure statement received by the Vegas from First Federal specifically indicated that "in no event will any portion of the unearned finance charge be charged for any prepayment." The effect of the acceleration clause contained in the note was consistent with this disclosure.

---

1. First Federal elected to provide the information required by the Truth in Lending Act by means of a separate disclosure statement pursuant to 12 C.F.R. § 226.8(a)(2). It is the sufficiency of the information contained in that separate statement which must be considered.

It stated that upon default, "the entire principal amount outstanding hereunder and *accrued interest* thereon shall at once become due and payable." (Emphasis added.) The acceleration clause in the mortgage was somewhat less clear. It provided that upon default, the creditor "may declare all of the sums secured by this Mortgage to be immediately due and payable." The district court held that the note and mortgage, read in conjunction with one another, allowed the acceleration of the principal due plus earned interest. We believe that the district court's construction of the documents was correct. Accordingly, unearned interest was not retained by First Federal either upon acceleration or upon prepayment. Since the practice was the same in both situations and since the prepayment practice was disclosed under 12 C.F.R. § 226.8(b)(7), separate disclosure of the same practice was not required under 12 C.F.R. § 226.8(b)(4). Therefore, First Federal's failure to disclose either the acceleration clause or the effect of such a clause was not a violation of the Truth in Lending Act.

### B. Attorneys' fees

█ Both the note and mortgage signed by the Vegas provided that in the event of a default, the bank "shall be entitled" to collection costs and reasonable attorneys' fees. This provision was not contained in the disclosure statement. The Vegas maintain that it should have been disclosed under 12 C.F.R. § 226.8(b)(4) as a default charge payable in the event of a late payment.

In Official Staff Interpretation No. FC–0054, the Federal Reserve Board staff concluded that charges for attorneys' fees and foreclosure costs need not be disclosed unless they are assessed automatically upon default.

> Specifically, you ask whether attorney's fees and foreclosure costs assessed on a non-automatic basis at the sole discretion of the creditor need to be disclosed pursuant to that section. It is staff's opinion that, if the imposition of these charges is automatic (for example, if the charge be-

comes immediately due and collectible by virtue of default), the charges must be disclosed under § 226.8(b)(4). If, however, the imposition of the charge is not automatic but is conditioned upon employment of the services of an attorney to effect collection or expenditure of amounts in conjunction with foreclosure proceedings, such charge need not be disclosed under § 226.8(b)(4).

This staff interpretation is controlling unless it is demonstrably irrational. *Ford Motor Credit Co. v. Milhollin, supra.* Those courts which have considered this same issue have consistently followed the staff interpretation. *Anderson v. Southern Discount Co.*, 582 F.2d 883 (4th Cir. 1978); *Price v. Franklin Investment Company, Inc.*, 574 F.2d 594 (D.C. Cir. 1978); *Mirabal v. General Motors Acceptance Corp.*, 537 F.2d 871 (7th Cir. 1976). We also believe that it is dispositive. Accordingly, since the imposition of attorneys' fees and foreclosure costs in this case was not automatic and was conditioned on incurring such expense, such charges were not required to be disclosed.

### C. Late payment charges

The disclosure statement which the Vegas received from First Federal reflected the basic finance charge on the loan. In addition, it indicated that if a monthly payment was not received within fifteen days of its due date, a late payment charge equal to 4% of the monthly payment would be assessed. The Vegas contend that this "late payment" charge represented an additional finance charge which should have been included in the computation of the basic finance charge.

The Truth in Lending Act requires that the finance charge on the loan and any delinquency, default, or late payment charges be disclosed separately. The distinction between the two types of charges is defined at 12 C.F.R. § 226.4(c).

> (c) *Late payment, delinquency, default, and reinstatement charges.* A late payment, delinquency, default, reinstatement, or other such charge is not a fi-

nance charge if imposed for actual unanticipated late payment, delinquency, default, or other such occurrence.

Through its official staff interpretations, the Federal Reserve Board has to some extent clarified this definition.

Because the distinction between "late payment" and "finance" charge depends upon the unique interplay of facts in each individual case, staff cannot provide an exhaustive list of factual criteria. Two generalized statements, however, can be made. A charge assessed for late payment is distinguishable from a finance charge in that it is imposed for an actual and unanticipated event and the ultimate evidence of the nature of a charge imposed is an objective viewing of the course of conduct between your client and each of his customers.

Insofar as the particular requirements of Interpretation § 226.401 are concerned, staff is of the opinion that the interpretation does not require termination of your client's service to his intermittently delinquent customers as a sine qua non to meeting the test set forth in § 226.4(c). On the other hand, continued imposition of late charges on a delinquent account, without taking positive action to collect the account, including eventual termination of additional credit privileges, would result in viewing such late charges as finance charges.

Official Staff Interpretation No. FC–0060.

The distinction between a late payment charge and a finance charge has generally been applied in determining whether a transaction was subject to the requirements of the Truth in Lending Act. In *Kroll v. Cities Service Oil Company*, 352 F.Supp. 357 (N.D.Ill.1972), Cities Service Oil Company billed its credit card holders on a monthly basis. If the bill was not paid within sixty days, a monthly charge of 1½% of the unpaid balance was assessed until the account was paid in full. The customer, however, was allowed the continued use of his credit card. As a defense to an action brought under the Truth in Lending Act, Cities Service contended that its monthly charge was a late payment charge rather than a finance charge and that therefore it was not a "creditor" within the meaning of the Act. The district court, relying on the fact that delinquent customers were still allowed to use their credit card, held that the monthly charge represented a finance charge. Accordingly, the court concluded that Cities Service was subject to the requirements of the Truth in Lending Act and that the proper disclosures were necessary. Other courts have confronted this same question in the same context of determining the applicability of the Act and have, under different factual circumstances, reached different conclusions. *See Bright v. Ball Memorial Hospital Association, Inc.*, 463 F.Supp. 152 (S.D.Ind.1979); *Rootberg v. American Express Company*, 352 F.Supp. 949 (S.D.N.Y.1972); *Garland v. Mobil Oil Corporation*, 340 F.Supp. 1095 (N.D.Ill. 1972).

But, in this case, the distinction between a finance charge and a late payment charge arises in a slightly different context. It is not the necessity of disclosure but the manner of disclosure that is in dispute. We find it difficult to characterize the charge in this case as anything but a late payment charge. The residential loan involved a single extension of credit payable in uniform monthly installments over a long period of time. If a monthly installment was not paid within fifteen days of its due date, a single charge of 4% of the installment was assessed. In the context of a residential loan, a delinquent payment clearly is "unanticipated" within the meaning of 12 C.F.R. § 226.4(c). Accordingly, we conclude that the charge in this case was not a finance charge.

Any other conclusion would undercut the very foundation of the Truth in Lending Act. The purpose of the Act is to insure meaningful disclosure of credit terms. If the finance charge contained in a disclosure statement reflected both the actual finance charge and a potential charge such as the one in this case, a consumer would not be informed of the amount that he was required to pay. That amount would vary

according to the extent to which he made his payments in a timely manner. The basis of the distinction between a finance charge and a late payment charge is that one represents an actual unavoidable charge while the other one simply represents a potential charge. The separate disclosure of both types of charges provides a consumer with an accurate picture of his obligations. Any attempt to combine these charges in a single figure would distort that picture. The disclosure statement received by the Vegas reflected both the actual finance charge and the potential charge in the event of late payments. Under the circumstances of this case, we believe that the separate disclosure of these charges was consistent with the purposes of the Truth in Lending Act.

## II.

### Real Estate Settlement Procedures Act

The purposes underlying the Real Estate Settlement Procedures Act are very similar to those of the Truth in Lending Act. Congress's intent was "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a).

Soon after the original Act took effect, Congress enacted a series of amendments eliminating certain requirements and creating additional flexibility in the Act. The original Act was found "to be unworkable, overly rigid in a number of other areas, and too inflexible to be administered adequately in those jurisdictions where real estate settlement practices needed the attention of Federal regulations." H.R.Rep.No.94–667, 94th Cong., 1st Sess. 2 (1975), *reprinted in* [1975] U.S.Code Code Cong. & Admin.News, pp. 2448, 2449. Since the Vegas received their loan prior to the effective date of the 1975 amendments, those amendments are not applicable to this case. Nonetheless since there are few decisions under the Real Estate Settlement Procedures Act, *see Sicinski v. Reliance Funding Corp.*, 82 F.R.D. 730 (S.D.N.Y.1979), the legislative history for both the original Act and the subsequent amendments provide about the only insight into the basic requirements of that Act.

### A. Uniform settlement statement

As originally enacted, the Real Estate Settlement Procedures Act authorized the Secretary of Housing and Urban Development to develop a standard real estate settlement form to be utilized in all federally related mortgage loans. 12 U.S.C. § 2603.[2] The costs of settlement were to be disclosed to the borrower prior to closing by means of this standard form. 12 U.S.C. § 2605.[3]

---

**2.** Section 4 of the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2603, provided that:

> The Secretary, in consultation with the Administrator of Veterans' Affairs, the Federal Deposit Insurance Corporation, and the Federal Home Loan Bank Board, shall develop and prescribe a standard form for the statement of settlement costs which shall be used (with such minimum variations as may be necessary to reflect unavoidable differences in legal and administrative requirements or practices in different areas in the country) as the standard real estate settlement form in all transactions in the United States which involve federally related mortgage loans. Such form shall conspicuously and clearly itemize all charges imposed upon the borrower and all charges imposed upon the seller in connection with the settlement and shall indicate whether any title insurance premium included in such charges covers or insures the

lender's interest in the property, the borrower's interest, or both. Such form shall include all information and data required to be provided for such transactions under the Truth in Lending Act and the regulations issued thereunder by the Federal Reserve Board, and may be used in satisfaction of the disclosure requirements of that Act, and shall also include provision for execution of the waiver allowed by section [6(c)].

This section was subsequently amended to permit the Secretary greater leeway in allowing variations from the prescribed form.

**3.** Section 6 of the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2605, provided in relevant part that:

> (a) Any lender agreeing to make a federally related mortgage loan shall provide or cause to be provided to the prospective borrower, to the prospective seller, and to any

Pursuant to this authority, the Secretary developed a uniform settlement statement and promulgated regulations controlling the extent to which the form of the statement could be varied.

(5) No changes in the size or type style of print or the layout of the first two pages of the form shall be made, except as follows: (A) The layout of the form may only be reset in type if such type style is approximately the same size and appearance, is easily readable, and the entire form layout is identical to the form as prescribed by HUD; and (B) where necessary to accommodate computer equipment, the first two pages of the form may be printed in a larger size of print and different type style and the distance between lines may be increased, but not decreased, but there shall be no other change in the layout and placement of information on the form. As to the third page, see Regulation Z, 12 CFR Part 226, and the Federal Reserve Board instructions in Appendix B.

24 C.F.R. § 82.6(b)(5).[4] With the exception of these changes and some other minor ones, any modifications in the uniform settlement statement were to be approved by the Secretary. 24 C.F.R. § 82.6(b)(13).

The Vegas contend that the settlement statement that they received from First Federal impermissibly varied from the one prescribed by the Secretary. The settlement statement provided by First Federal capitalized certain items that were not capitalized in the uniform settlement statement and failed to capitalize other items. The Vegas maintain that even though the deviations were minor, they constitute violations of the Real Estate Settlement Procedures Act.

■ It is at least arguable that the changes in the capitalization of certain items in the settlement statement were permissible under 24 C.F.R. § 82.6(b)(5)(A).[5] The type style was approximately the same size and appearance, was easily readable, and the layout of the form was approved by

4. officer or agency of the Federal Government proposing to insure, guarantee, supplement, or assist such loan, at the time of the loan commitment, but in no case later than twelve calendar days prior to settlement, upon the standard real estate settlement form developed and prescribed under section [4,] or upon a form developed and prescribed by the Secretary specifically for the purposes of this section, and in accordance with regulations prescribed by the Secretary, an itemized disclosure in writing of each charge arising in connection with such settlement. For the purposes of complying with this section, it shall be the duty of the lender agreeing to make the loan to obtain or cause to be obtained from persons who provide or will provide services in connection with such settlement the amount of each charge they intend to make. In the event the exact amount of any such charge is not available, a good faith estimate of such charge may be provided.

This section was subsequently repealed. Nevertheless, a less stringent form of advance disclosure is still required. The lender must provide the borrower with a good faith estimate of the settlement costs. 12 U.S.C. § 2604(c). In addition, the lender must complete and make available to the borrower either before or at settlement a uniform settlement statement reflecting the actual settlement costs. 12 U.S.C. § 2603(b).

4. Consistent with the subsequent amendments to § 2603, see note 1, *supra,* the Secretary promulgated new regulations which were more permissive in allowing variations from the uniform settlement statement. The new regulations provide that:

(5) The following variations in layout and format are within the discretion of persons reproducing HUD-1 and do not require prior HUD approval: size of pages; tint or color of pages; size and style of type or print; vertical spacing between lines or provision for additional horizontal space on lines (for example, to provide sufficient space for recording time periods used in prorations); printing of HUD-1 contents on separate pages, on the front and back of a single page, or on one continuous page; use of multicopy tear-out sets; printing on rolls for computer purposes; reorganization of Sections B through I where necessary to accommodate computer printing; placement on the form the HUD number but not the OMB approval number, neither of which in any case may be deleted from the form.

12 C.F.R. § 3500.9(a)(5).

5. It seems clear that such changes would be permissible under the new regulations. See note 3, *supra.*

the Secretary.[6] But even assuming that the changes were not technically within the ambit of 24 C.F.R. § 82.6 we do not believe that the Real Estate Settlement Procedures Act creates such a rigid and inflexible standard so as to impose civil liability for deviations from the uniform settlement statement which could not possibly impair the effectiveness of such statements. In some cases, even technical changes in the uniform settlement statement represent a threat to the basic purposes of the statement. Thus, even minor changes in the language of the uniform settlement statement would create confusion and hinder the comparison of settlement costs by consumers. Changes in the format of the statement would generate similar difficulties. Moreover, significant changes in the type style might also prevent the meaningful disclosure of settlement costs to the consumer. But the settlement statement in this case presents none of these potential dangers. The Vegas received a settlement statement utilizing the precise terms prescribed by regulation and in a format approved by the Secretary. The changes in the capitalization of certain terms did not obfuscate any of the information contained in the settlement statement. Under such circumstances, we do not believe that such changes constituted a violation of the Real Estate Settlement Procedures Act.

### B. Escrow account

■ The Real Estate Settlement Procedures Act imposes certain limits on the amount that a lender may require a borrower to deposit in an escrow account with respect to taxes and insurance. The relevant section of the Act provides that:

> No lender, in connection with a federally related mortgage loan, shall require the borrower or prospective borrower—
>
> (1) to deposit in any escrow account which may be established in connection with such loan for the purpose of assuring payment of taxes and insurance premiums with respect to the property, prior to or upon the date of settlement, an aggregate sum (for such purpose) in excess of—
>
> (A) in any jurisdiction where such taxes and insurance premiums are postpaid, the total amount of such taxes and insurance premiums which will actually be due and payable on the date of settlement and the pro rata portion thereof which has accrued, or
>
> (B) in any jurisdiction where such taxes and insurance premiums are prepaid, a pro rata portion of the estimated taxes and insurance premiums corresponding to the number of months from the last date of payment to the date of settlement,
>
> plus one-twelfth of the estimated total amount of such taxes and insurance premiums which will become due and payable during the twelve-month period beginning on the date of settlement.

12 U.S.C. § 2609.[7] The Vegas contend that they were required to deposit an excessive sum in an escrow account for the payment of taxes.[8]

---

**6.** First Federal applied for and received permission from the Secretary to change certain aspects of the uniform settlement statement. In approving these changes, the Secretary apparently had a copy of the actual form used by First Federal and did not note any problems with that form.

**7.** This section was subsequently amended to allow slightly larger deposits in escrow "since monthly mortgage payments are often due shortly before a tax payment should be made and such mortgage payments are often made late." H.R.No.94–667, 94th Cong., 1st Sess. 2 (1975), *reprinted in* [1975] U.S.Code Cong. & Admin.News, p. 2454.

**8.** As a threshold matter, we must determine whether the Real Estate Settlement Procedures Act creates a private cause of action for violations of 12 U.S.C. § 2609 and 12 U.S.C. § 2610. While the Act does not expressly provide for such a causes of action, we believe, based on the legislative history, that Congress intended to create a private remedy for violations of the Act. *See Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). *See also Taylor v. Brighton Corporation,* 616 F.2d 256 (6th Cir. 1980).

██ The only dispute between the parties is as to the meaning of "one-twelfth of the estimated total amount of such taxes and insurance premiums which will become due and payable during the twelve-month period beginning on the date of the settlement." It seems clear, both from the statutory language and its legislative history, that this clause refers to one-twelfth of the annual taxes payable on the property. Applying this construction of the statute, the Vegas were not required to deposit an excessive sum in escrow for the payment of taxes.

### C. Costs of preparing disclosure statements

██ The Real Estate Settlement Procedures Act prohibits the imposition of any charge for the preparation of statements required by its provisions or those of the Truth in Lending Act. 12 U.S.C. § 2610.[9] In their complaint, the Vegas alleged that First Federal had improperly included the cost of preparing statements required by the Acts as an element of settlement costs. The district court granted summary judgment in favor of First Federal on this claim. The court relied on an affidavit submitted by an officer of First Federal which stated that First Federal had not increased its closing fees since the enactment of the Real Estate Settlement Procedures Act. There was nothing in the record which contradicted this affidavit. The Vegas did not file any affidavits indicating a different set of facts. Nor did the Vegas present reasons why such opposing affidavits could not be produced as required under Rule 56(f) of the Federal Rules of Civil Procedure.

Nonetheless, we believe that summary judgment was improper due to the fact that the Vegas were denied the opportunity to conduct any discovery.[10] The Vegas had filed two sets of interrogatories in an attempt to determine the various cost elements in the closing fees of First Federal. First Federal had objected to those interrogatories and had refused to produce any information. This discovery dispute was still unresolved when the district court granted summary judgment in favor of First Federal. Unlike the other claims asserted by the Vegas, this one presented both a factual and a legal issue. Prior to deciding such a factual issue by means of summary judgment, a district court must provide both parties an opportunity to conduct some discovery. *Parrish v. Board of Commissioners*, 533 F.2d 942 (5th Cir. 1976). This opportunity for discovery is even more critical in cases such as this one where the defendant possesses all of the relevant information. Only through discovery can it be determined whether a material factual issue exists which precludes summary judgment. In this case, the Vegas were denied the opportunity to pursue relevant avenues of inquiry concerning the settlement costs imposed by First Federal. Accordingly, we believe that summary judgment was inappropriate.

### III.

### Conclusion

For the above reasons, we reverse the entry of summary judgment with respect to the claim that First Federal included the cost of preparing disclosure statements in its settlement costs. This claim is remand-

**9.** Section 12 of the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2610, provides:

No fee shall be imposed or charge made upon any other person (as a part of settlement costs or otherwise) by a lender in connection with a federally related mortgage loan made by it (or a loan for the purchase of a mobile home), for or on account of the preparation and submission by such lender of the statement or statements required (in connection with such loan) by sections [4] and [6] of this [Act] or by the Truth in Lending Act.

**10.** We need not and do not decide whether First Federal would be entitled to prevail even if it is undisputed that its settlement charges have not been increased. After the facts are developed through discovery, it will still be necessary to determine whether any charge made by First Federal, whether or not it was being made in the past, is now proscribed by the Act.

ed to the district court so that the Vegas can conduct the appropriate discovery. In all other respects, the decision of the district court is hereby affirmed.