Howard HERRMANN

v.

**MERIDIAN MORTGAGE CORPORATION.**

**Civ. A. No. 93–2224.**

United States District Court, E.D. Pennsylvania.

Sept. 12, 1995.

Cary L. Flitter, Lundy, Flitter & Beldecos, P.C., Narberth, PA, Barry G. Reed, Zimmerman, Reed, Minneapolis, MN, for Howard Herrmann, Plaintiff.

Alan J. Hoffman, Ann B. Laupheimer, Blank, Rome, Comisky & McCauley, Philadelphia, PA, Robert J. Pratte and Alan H. Maclin, Briggs and Morgan, P.A., Minneapolis, MN, for Meridian Mortgage Corporation, Defendant.

OPINION

LOUIS H. POLLAK, District Judge.

The motion to be addressed is plaintiff Howard Herrmann's motion for preliminary approval of a proposed class settlement of Herrmann's pending suit against defendant Meridian Mortgage Corporation.

I.

A. *The Pleadings*

The pending suit is a proposed class action brought by Herrmann, a Pennsylvania resident, against Meridian, a company which deals in home mortgages and has a place of business in Pennsylvania. Meridian is both an originating lender and a servicer of home mortgages assigned to it by other lending institutions. According to the amended complaint, Herrmann has a home mortgage with Meridian, pursuant to which Meridian maintains an escrow account funded by Herrmann from which Meridian pays out sums periodically due for insurance and property taxes and the like. What gives rise to this lawsuit is Herrmann's claim that Meridian routinely requires Herrmann (and other mortgagors similarly situated) to maintain an escrow account balance which exceeds (a) the amount contemplated by the governing mortgage contract and, more importantly, (b) the amount permitted by section 10 of the federal Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2609(a). RESPA is a statute enacted in 1974 (and thereafter occasionally amended, most recently in 1990), which was intended "to effect certain changes in the settlement process for residential real estate," including "a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance." 12 U.S.C. § 2601(b). The somewhat delphic text of section 10 of RESPA is set forth in a footnote.[1] As Herrmann has

---

1. (a) In general

A lender, in connection with a federally related mortgage loan, may not require the borrower or prospective borrower—

(1) to deposit in any escrow account which may be established in connection with such loan for the purpose of assuring payment of taxes, insurance premiums, or other charges with respect to the property, in connection with the settlement, an aggregate sum (for such purpose) in excess of a sum that will be sufficient to pay such taxes, insurance premiums and other charges attributable to the period beginning on the last date on which each

rendered section 10 into English in his amended complaint, the statutory provision "prohibits lenders and mortgage servicers from requiring homeowners to maintain at all times in escrow accounts an amount which exceeds ⅙ of the total yearly amounts necessary to pay taxes and insurance premiums due on the property...." Amended Complaint in Class Action ¶ 1.

Herrmann's amended complaint, which speaks both for present and past Meridian mortgagors, is somewhat parsimonious with respect to jurisdictional allegations—there are none—but it does set forth five causes of action. The first cause of action is the one of chief substantive importance, alleging that Meridian, through its escrow account balance requirements, "repeatedly violates § 10 of RESPA." The first cause of action also appears to be the one of chief procedural importance since—albeit without any mention of Title 28—it appears intended to invoke this court's federal question jurisdiction. The second cause of action alleges that the escrow account balance requirements breach Herrmann's mortgage contract with Meridian. The third cause of action alleges that Meridian "deliberately and/or negligently misrepresented to Plaintiff and the other members of the Plaintiff Class that it is managing and servicing its mortgage escrow accounts in accordance with RESPA, in accordance with the requirements of its contract with Plaintiff, and in all other respects

in a lawful manner, and requiring homeowners to maintain only those escrow balances required or permitted by law." The fourth cause of action alleges that "[b]y unlawfully keeping and maintaining excessive balances in such mortgage accounts," Meridian has breached what is alleged to be the fiduciary duty Meridian, as "escrowing agent and trustee," owes to Herrmann. The fifth cause of action alleges that the "acts and omissions of Meridian as above described constitute unfair or deceptive acts or practices" contravening Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201 *et seq.*[2]

The amended complaint seeks (1) a declaration of the illegality, under RESPA and the governing mortgage contract, of Meridian's escrow account balance practices; (2) an injunction against requiring excessive escrow account balances; (3) the payment to each "mortgagor [of] a refund of any excess balances plus interest;" and (4) an award to the class of "its costs and disbursements, including reasonable attorneys' fees."

Meridian's answer to the amended complaint interposes seventeen defenses. The seventeenth recites that "Herrmann's 'first cause of action' fails because there is no private right of action under RESPA." Answer and Affirmative Defenses of Defendant Meridian Mortgage Corporation ¶ 55.

such charge would have been paid under the normal lending practice of the lender and local custom, provided that the selection of each such date constitutes prudent lending practice, and *ending on the due date of its first full* installment payment under the mortgage, plus one-sixth of the estimated total amount of such taxes, insurance premiums and other charges to be paid on dates, as provided above, during the ensuing twelve-month period; or

(2) to deposit in any such escrow account in any month beginning with the *first full* installment payment under the mortgage a sum (for the purpose of assuring payment of taxes, insurance premiums and other charges with respect to the property) in excess of the sum of (A) one-twelfth of the total amount of the estimated taxes, insurance premiums and other charges which are reasonably anticipated to be paid on dates during the ensuing twelve months which dates are in accordance with *the normal lending practice of the lender and* local custom, provided that the selection of

each such date constitutes prudent lending practice, plus (B) such amount as is necessary to maintain an additional balance in such escrow account not to exceed one-sixth of the estimated *total amount of such taxes, insurance* premiums and other charges to be paid on dates, as provided above, during the ensuing twelve-month period: **Provided, however,** That in the event the lender determines there will be or is a deficiency he shall not be prohibited from requiring additional monthly deposits in such escrow account to avoid or eliminate such deficiency.

2. Although the amended complaint undertakes to speak for Herrmann and other members of the putative class, it appears that two of the five causes of action—the second, alleging breach of contract; and the fourth, alleging breach of fiduciary duty—relate in terms only to Herrmann. The other three causes of action speak more generally.

## B. *The Proposed Settlement*

Subsequent to the filing of Meridian's answer, the parties pursued discovery. Of particular importance to counsel for the putative class was information acquired in discovery relating to "the number of escrowed mortgage loans serviced by Defendant and the methodology used by Defendant in calculating and accumulating escrow payments." Settlement Agreement and Release ¶ 5. Discussions ensued which have led to a proposed resolution of the suit—a proposed resolution that is embodied in a Settlement Agreement which has been submitted to this court for preliminary approval.

The Settlement Agreement provides for the division of the plaintiff class of Meridian mortgagors into two subclasses: (1) persons with escrowed mortgage loans serviced by Meridian as of January 1, 1995, and (2) persons who had such loans for at least twelve consecutive months between January 1, 1984 and December 31, 1994.

The first subclass—mortgagors on Meridian's rolls as of January 1, 1995—are to receive the bulk of the relief contemplated by the Settlement Agreement. The central element of that relief is Meridian's commitment to change to a new method of calculating required escrow balances for all mortgages on its books as of January 1, 1995 and thereafter. The agreed method—denominated "aggregate escrow analysis methodology"—contemplates that (1) defendant Meridian may "require that the mortgagor pay a monthly escrow deposit equal to the sum of the separate one-twelfth (1/12) fractions of each individual item" of taxes, insurance and other anticipated disbursements, and (2) "the low point in the mortgagors' escrow account [is] not to exceed a maximum of two monthly installments of the aggregate escrow deposits." In addition, each member of the first subclass is to receive $1.

Members of the second subclass—persons who had Meridian mortgages for at least twelve consecutive months between January

1, 1984 and December 31, 1994—are each to receive $1.50.

Plaintiff Howard Herrmann, as class representative, is to receive $2000. And, finally, Meridian agrees to create a fund of $100,000 from which the court is to award attorney's fees, costs and expenses; Meridian will acquiesce in an award not exceeding $100,000.

The form of the settlement agreement closely parallels the settlement agreement preliminarily approved by my colleague, Judge Robreno, in *Lake v. First Nationwide Bank,* 156 F.R.D. 615 (E.D.Pa.1994). *Lake* was a class action complaining about the maintenance by First Nationwide Bank of mortgage escrow account balances allegedly exceeding the levels permitted by section 10 of RESPA. The law firms which represented the plaintiff class in *Lake* are counsel for plaintiff Herrmann in the case at bar.

## II.

When the settlement agreement in *Lake* was submitted to the court for preliminary approval, Judge Robreno "*sua sponte* broached the issue of subject matter jurisdiction." 156 F.R.D. at 619. In response, the Lakes, as representatives of the putative class, amended their complaint and filed a memorandum of law in support of their claim that section 10 of RESPA, together with 28 U.S.C. § 1331, conferred on federal district courts federal question jurisdiction over lawsuits whose gravamen is the contention that a mortgagee breaches section 10 by requiring mortgagors to maintain excessive escrow balances.[3]

In addressing the *Lake* plaintiffs' jurisdictional claim, Judge Robreno was chiefly concerned with whether section 10 of RESPA, while not in terms creating a federal cause of action assertable by the mortgagor against the mortgagee, should nonetheless be read as reflecting a congressional intent to create such a cause of action by implication—the question of congressional intent being, under *Touche Ross & Co. v. Redington,* 442 U.S.

---

3. In support of jurisdiction, the *Lake* plaintiffs also alleged, "[u]pon information and belief, *Defendant* will assert jurisdiction by reason of the provisions of 28 U.S.C. § 1332." 156 F.R.D. at 620. Judge Robreno was underwhelmed by "this rather curious attempt by the plaintiffs to allege that the defendant will somehow claim and establish that diversity jurisdiction exists in this matter...." *Id. See also id.* at 622 n. 5.

560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979), the "central inquiry" in determining whether a statute encompasses an implied cause of action. Judge Robreno noted that the Sixth Circuit in *Vega v. First Federal Savings & Loan Ass'n*, 622 F.2d 918 (6th Cir.1980), had in fact read section 10 as establishing such an implied cause of action—"While the Act does not expressly provide for such a cause of action, we believe, based on the legislative history, that Congress intended to create a private remedy for violations of the Act." *Id.* at 925 n. 8. Moreover, Judge Robreno noted that Judge Posner, dissenting (with Judge Cudahy) from the Seventh Circuit's denial of *en banc* rehearing in *Allison v. Liberty Savings*, 695 F.2d 1086, 1091 (7th Cir.1982), reached the same conclusion: "I believe that the nature of the right created, a pecuniary right of borrowers, coupled with the absence of express provision of any alternative remedy to damages for the enforcement of that right, supports an inference that Congress, had it thought about the matter, would have wanted suits for restitution of money withheld in violation of section 10 to be maintainable in federal courts." *Id.* at 1093. However, Judge Robreno also observed that "there is significant authority to the contrary," 156 F.R.D. at 621. First, Judge Robreno cited the Seventh Circuit's panel opinion in *Allison*, 695 F.2d 1086 (the opinion of Judge Eschbach that Judge Posner, joined by Judge Cudahy, had unsuccessfully urged *en banc* rehearing of), which (a) after taking note of the Sixth Circuit's reference to "legislative history" as supporting an implied cause of action, stated that "[w]e have been unable to find anything in the legislative history supporting this conclusion," *id.* at 1091, and (b) observed that "[t]he fact that Congress explicitly provided federal remedies in three of the four sections immediately preceding § 10 is evidence that Congress intended to deny such remedies by its silence in § 10." *Id.* at 1088–89.[4] Judge Robreno also cited two subsequent district court opinions that were in accord with the *Allison* majority.[5]

Against this background, Judge Robreno concluded that the contention that a section 10–based claim was a judicially cognizable federal cause of action, even if a minority view, was nonetheless at least sufficiently

---

**4.** Judge Eschbach's explication of Section 10 in its statutory context merits full quotation:

> We begin our inquiry with the language of the statute itself. *Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* 444 U.S. at 16, 100 S.Ct. at 245; *Touche Ross & Co. v. Redington, supra,* 442 U.S. at 568, 99 S.Ct. at 2485. Section 10 of RESPA is silent on the subject of remedies, stating simply that a "lender, in connection with a federally related mortgage loan, may not require the borrower or prospective borrower ... to deposit in any escrow account which may be-established in connection with such loan for the purpose of assuring payment of taxes, insurance premiums, or other charges with respect to the property," an amount in excess of that fixed by certain formulas. 12 U.S.C. § 2609. Section 10's silence on the subject of remedies is in sharp contrast to the remedial provisions of §§ 6 (now repealed), 8 and 9, which explicitly create private causes of action. "Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington, supra,* 442 U.S. at 572, 99 S.Ct. at 2487. We recognize that the private remedies provided in §§ 8 and 9 are extraordinary, utilizing a treble liquidated damage formula that a court could not invoke unless explicitly created by Congress. But the remedy in § 6 was a fairly straightfor-

> ward private action, extraordinary only in setting $500 minimum damages and allowing recovery of reasonable attorney fees. The fact that Congress explicitly provided federal private remedies in three of the four sections immediately preceding § 10 is evidence that Congress intended to deny such remedies by its silence in § 10.
>
> This interpretation is bolstered by an examination of § 16 of RESPA, which provides:
>
> Any action to recover damages pursuant to the provisions of section 2605 [§ 6], 2607 [§ 8], or 2608 [§ 9] of this title may be brought in the United States district court for the district in which the property involved is located, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.
>
> 12 U.S.C. § 2614. Here again, congressional attention was focused on private remedies with no mention of private actions under § 10, indicating that Congress did not intend a private action under § 10. *See Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* 444 U.S. at 21, 100 S.Ct. at 247.
>
> *Allison,* 695 F.2d at 1088–89.

**5.** *Bergkamp v. New York Guardian Mortgagee Corp.,* 667 F.Supp. 719 (D.Mont.1987) (Lovell, J.); *Michels v. Resolution Trust Corp.,* Civ. No. 4–93–1167, 1994 WL 242162, 1994 Lexis 6563 (D.Minn. Apr. 13, 1994) (Diana E. Murphy, J.).

arguable so as to vest a district court with subject-matter jurisdiction. Drawing on applicable Third Circuit authority—namely, that "dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy,'" *Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 899 (3d Cir.1987) (quoting *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974))—Judge Robreno held that "the cause of action asserted by the Lakes is a nonfrivolous cause of action sufficient to invoke this Court's federal question jurisdiction under 28 U.S.C. § 1331." 156 F.R.D. at 621–22.

Having determined that he had jurisdiction, Judge Robreno went on to assess—and ultimately give preliminary approval to—the proposed settlement. Judge Robreno did note that, were he called on to decide whether Congress intended section 10 to give rise to a judicially cognizable cause of action, he "would probably agree with the well-reasoned opinion of the Seventh Circuit in *Allison v. Liberty Savings,* 695 F.2d at 1090–91, which found the necessary Congressional in-

tent lacking." *Id.* at 627. However, the shakiness of the *Lake* plaintiffs' legal footing was not a ground for rejecting the proposed settlement. To the contrary, "[t]his very weakness ... gives greater force to the argument in favor of settlement. The proposed settlement will insure that First Nationwide will comply with § 10 in the future, as well as provide some relief to the class members for damages incurred." *Id.* at 627–28.[6]

### III.

Following Judge Robreno's example, I felt that in the case at bar it would be prudent to ask counsel to submit memoranda on whether plaintiffs have asserted a federal claim sufficiently substantial to authorize this court to proceed.

The memoranda submitted by the parties in response to this court's request for guidance are in agreement that, notwithstanding that the case law construing section 10 reflects considerable uncertainty that section 10 embraces an implied cause of action, the argument in favor of such an implied cause of action has enough substance to vest this court with federal question jurisdiction and, therefore, with the authority to entertain the proposed settlement agreement.[7] Understandably, the parties' memoranda rely

---

**6.** Judge Robreno was careful to point out that the damages awarded were not expected to amount, on a per class-member basis, to "more than a few dollars." 156 F.R.D. at 628 n. 15. As previously noted, in the case at bar the proposed agreement contemplates individual awards of $1 or $1.50.

**7.** Defendant, in its enthusiasm for the proposition that this court has subject-matter jurisdiction, advances an argument not presented by plaintiffs: namely, that causes of action other than the first (which is the claim directly bottomed on Section 10) can be properly viewed as federal question claims, for the reason that they too depend, although less directly, on the contention that defendant has violated Section 10. For example, defendant points to the third cause of action which alleges that defendant "has deliberately and/or negligently misrepresented to Plaintiff and the other members of the Plaintiff Class that it is managing and servicing its mortgage escrow accounts in accordance with RESPA," contending that the stated claim of misrepresentation thus stands or falls on the construction of RESPA and its application to the particular facts of defendant's escrow practices. In similar fashion, defendant reads the fourth cause of action,

which alleges that defendant breached its fiduciary duty to plaintiff "[b]y unlawfully keeping and maintaining excessive balances in such mortgage accounts ... and by its violations of law," as bringing RESPA into play. But incorporation of a federal statute in a state-law claim is insufficient to establish the claim as one presenting a federal question unless the federal statutory provision thus incorporated—in this instance, Section 10 of RESPA—is one which is itself the source of a federal cause of action: "The decisions interpreting § 1331 can be best summarized by the following principle: a case arises under federal law if it is apparent from the face of the plaintiff's complaint either that the plaintiff's cause of action was created by federal law; or, if the plaintiff's cause of action is based on state law, a federal law that creates a cause of action is an essential component of the plaintiff's claim." Erwin Chemerinsky, *Federal Jurisdiction* 231 (1989). And see *id.* at 241. Thus, if plaintiff's first cause of action—resting directly on Section 10—does not state a cognizable federal claim, the third and fourth causes of action are similarly flawed.

heavily on Judge Robreno's very thoughtful jurisdictional analysis in *Lake*. And I have no quarrel with that analysis. To the contrary, I find it entirely persuasive. It seems to me that the Sixth Circuit's pronouncement in *Vega*, buttressed by Judge Posner's dissent from rehearing in *Allison*, establishes that a non-frivolous argument can be made that section 10 creates, by implication, a cause of action assertable in a federal court by a mortgagor against a mortgagee for breach of the prescribed escrow account practices. Since the argument is non-frivolous, this court has jurisdiction to entertain plaintiff's first cause of action—and, via this court's supplemental jurisdiction, the balance of plaintiff's claims.

My difficulty arises at the next step down the road. Granted that I have jurisdiction, must I exercise it to address the merits of a settlement proposal which, if approved, will resolve the litigation in a manner favorable in some measure to the proposed plaintiff class but which will leave unanswered the question whether plaintiff's central claim that defendant has violated a federal statute is cognizable in a federal court?

This latter question comes to me in a form different from the way it presented itself to Judge Robreno. Having surveyed the reported case law as it stood at the time he decided *Lake*, Judge Robreno stated that if called on to determine whether section 10 creates an implied cause of action he would "probably" conclude that it does not. 156 F.R.D. at 627. Since then there have been three additional reported cases and none has found the *Vega* pronouncement persuasive: The first was *Bloom v. Martin*, 865 F.Supp. 1377 (N.D.Cal.1994), in which one of the questions for decision was whether section 4 of RESPA—which requires the lender to submit to the borrower a HUD–prescribed form which "shall ... itemize all charges imposed upon the borrower and all charges

imposed upon the seller in connection with the settlement," 12 U.S.C. § 2603(a)—creates an implied cause of action; in a meticulous dissection of RESPA, Judge Armstrong drew on *Allison*'s analysis of section 10 in determining that section 4 also does not create an implied cause of action.[8] The second was *Campbell v. Machias Sav. Bank*, 865 F.Supp. 26, 31–32 (D.Me.1994), in which section 10 was directly in issue; Judge Morton A. Brody's careful assessment of the section 10 case law concluded that *Allison* was correct. Finally, in *State of Louisiana v. Litton Mortg. Co.*, 50 F.3d 1298, 1300–02 (5th Cir.1995), a third court of appeals—the Fifth Circuit—entered the fray.

In *Litton*, the State of Louisiana, evidently acting as *parens patriae* for Louisiana homeowners, brought a civil action against certain mortgage-servicing companies, alleging that the defendants required mortgagors to maintain excessive escrow balances. The State's principal reliance—substantively and jurisdictionally—was on section 10 of RESPA.[9] The district court dismissed the complaint, finding, *inter alia*, that section 10 created no cognizable cause of action. In a *per curiam* opinion, Judges Van Graafeiland,[10] Jolly, and Wiener addressed, but found no merit in, the State's appeal:

> Applying *Cort*'s [*Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975) ] four-part test to Section 10, the State reasons that (1) the plaintiff is a member of the class for whose special benefit the statute was enacted; (2) as § 2609(a) does not provide any other remedy, the provision would be superfluous and ineffective without a private cause of action; (3) an implied right of private action is consistent with the purposes of the legislative scheme; and (4) even though injured borrowers could seek relief under state law, the likelihood of inconsistent results is high. The State glosses over subsequent cases in which the Supreme Court depart-

---

**8.** *Bloom v. Martin* was decided on July 22, 1994, a week before *Lake*. But of course it did not appear in Federal Supplement until some weeks later.

**9.** In addition, the State asserted supplemental state law claims. Originally the State also asserted certain RICO claims; these were aban-

doned, and then, belatedly and unsuccessfully, the State sought to replead them. The procedural issues attendant on the non-Section 10 claims are not touched on here since they are not pertinent to the questions posed by the case at bar.

**10.** Sitting by designation.

ed from *Cort* to conclude that the weightiest factor in determining whether a statute implies a private right of action is whether Congress intended to create one. Moreover, the State apparently overlooks the fact that the absence of legislative history regarding Congress' intent to create a private right of action generally augurs against implying a private cause of action.

The circuits are split on this precise issue. After considering the opposing position of *Vega v. First Federal Savings & Loan Association of Detroit,* we find most persuasive the Seventh Circuit's well-reasoned opinion in *Allison v. Liberty Savings.* In reaching its conclusion that Section 10 of RESPA does not create a private right of action, the *Allison* court acknowledged the *Cort* test, yet recognized that the central inquiry for determining whether a statute creates a private cause of action is whether Congress intended to create a private remedy. Observing that Congress explicitly provided federal private remedies in other sections of the Act but not in Section 10, and that there was no legislative history on the issue, the *Allison* court concluded that when "analysis of the statute itself weighs against implication of a private cause of action and the legislative history is silent, we must conclude that Congress did not intend to create a private remedy." The court stopped its analysis at that point, noting that "once we have concluded that Congress did not intend to create a private remedy, our inquiry is at an end." In addition to the reasoning of *Allison,* we are persuaded further by the fact that when Congress did amend Section 10—which occurred after *Allison*—it added penalties for violations of a different provision of that section but not for violations of the provision limiting escrow deposit accounts. We also note in passing that four district courts sitting in three additional circuits have adhered to *Allison* when concluding or observing that Section 10 of RESPA does not imply a private right of action. We are comfortable in deciding for this circuit that there is no private right of action under Section 10 of RESPA.

*Litton,* 50 F.3d at 1301–02 (footnotes omitted).

What *Litton* makes plain is that the case for construing section 10 to contain an implied cause of action is even weaker—measurably weaker—than it was in 1982 when the Seventh Circuit, in *Allison,* after close analysis of the text and context of section 10, declined to follow the *Vega* pronouncement of two years before. *Litton* underscores the fact that Congress, in revisiting RESPA following *Allison,* has further undercut *Vega.* In 1990 Congress overhauled RESPA and made no change in section 10. But the changes in RESPA which Congress did make included the addition to the codified form of section 10—12 U.S.C. § 2609(a)—of three new code subsections, namely, 12 U.S.C. § 2609(b), (c) and (d); § 2609(c) is directive,[11] and § 2609(d) specifies penalties—to be assessed *not* by a court but by the Secretary of HUD—for violations of § 2609(c).[12] Given the case law—*Vega, Alli-*

11. 12 U.S.C. § 2609(c) provides, in pertinent part:

**(c) Escrow account statements**
  **(1) Initial statement**
    **(A) In general**
    Any servicer that has established an escrow account in connection with a federally related mortgage loan shall submit to the borrower for which the escrow account has been established a statement clearly itemizing the estimated taxes, insurance premiums, and other charges that are reasonably anticipated to be paid from the escrow account during the first 12 months after the establishment of the account and the anticipated dates of such payments.

12. 12 U.S.C. § 2609(d) provides:
**(d) Penalties**

  **(1) In general**
    In the case of each failure to submit a statement to a borrower as required under subsection (c) of this section, the Secretary shall assess to the lender or escrow servicer failing to submit the statement a civil penalty of $50 for each such failure, but the total amount imposed on such lender or escrow servicer for all such failures during any 12–month period referred to in subsection (b) of this section may not exceed $100,000.
  **(2) Intentional violations**
    If any failure to which paragraph (1) applies is due to intentional disregard of the requirement to submit the statement, then, with respect to such failure—
      **(A)** the penalty imposed under paragraph (1) shall be $100; and

*son,* and *Bergkamp*—which had developed prior to 1990, it is hard to credit the supposition that the Congress which in 1990 left section 10 untouched but added an adjacent requirement enforceable by the Secretary contemplated that section 10 established a judicially cognizable cause of action.

In sum, the case for reading section 10 as the source of an implied cause of action comes down to this: Writing in 1980, the *Vega* court was the first court to address the question whether section 10 is a proper vehicle for a federal lawsuit, and it answered that question in the affirmative. Fifteen years later, the Sixth Circuit is still apparently the only court which has, in a reported opinion, detected in section 10 a judicially cognizable cause of action.[13] The best that can be said for the *Vega* result is Judge Posner's verdict in his *Allison* dissent—namely, that "Congress, had it thought about the matter, would have wanted suits for restitution of money withheld in violation of section 10 to be maintainable in federal courts." *Allison,* 695 F.2d at 1093. What Congress would likely have done "had it thought about the matter" might well have satisfied the *Cort v. Ash* standard. But, as *Litton* makes clear, it does not satisfy the intent standard authoritatively established by later cases: The controlling case law is reflected in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979), *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 24, 100 S.Ct. 242, 245, 249, 62 L.Ed.2d 146 (1979), and *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1102, 111 S.Ct. 2749, 2763, 115 L.Ed.2d 929 (1991). *See Reschini v. First Federal Savings & Loan,* 46 F.3d 246, 255 (3d Cir.1994). As the Third Circuit has recently put the matter: "Where a statute does not explicitly create a right of action for a particular party, a court

may find such a right implied only where it can confidently conclude Congress so intended." *New Jersey Department of Environmental Protection & Energy v. Long Island Power Authority,* 30 F.3d 403, 421 (3d Cir. 1994). With respect to section 10 of RESPA, one certainly cannot confidently conclude that Congress did so intend. Indeed, one can confidently conclude that Congress did not so intend—or, to put it more precisely, that Congress has at no time evidenced any objective manifestation of so intending.

### IV.

For the reasons just given, I am persuaded that plaintiff Herrmann's first cause of action fails to state a claim on which relief can be granted by a federal court. Given the insufficiency of the first cause of action, I am likewise persuaded, for reasons canvassed in footnote 7, *supra,* that plaintiff's third and fourth causes of action—relied on by defendant, but not by plaintiff, as stating judicially cognizable federal claims—also fail to state claims on which relief can be granted by a federal court. Since plaintiff's second and fifth causes of action are not characterized by either party as claims arising under federal law, I conclude that no aspect of plaintiff's amended complaint presents a tenable ground for suit in a federal court.

Can my conclusion that the complaint fails to state a claim cognizable in this court entail any operative consequences, given that the defendant has not filed a Rule 12(b)(6) motion to dismiss? That is to say, does a district court have authority to dismiss a complaint on its own initiative where no motion to dismiss has been filed? The Supreme Court has, thus far, declined to answer this question: "We have no occasion to pass judgment ... on the permissible scope, if any, of

---

**(B)** in the case of any penalty determined under subparagraph (A), the $100,000 limitation under paragraph (1) shall not apply.

**13.** The *Vega* court's explication of the section 10 issue (quoted *supra,* p. 919) is a single conclusory sentence. It may also be noted that the *Vega* court, after announcing that plaintiffs' section 10 claim was judicially cognizable, went on to find that on the merits plaintiffs' claim was without foundation. 622 F.2d at 925–26. The district

court (Keith, J.) had granted summary judgment in defendant's favor on the merits of, *inter alia,* plaintiffs' section 10 claim; the district court's opinion does not discuss the legal viability of a claim based on section 10, but this is not surprising given that nothing in the opinion suggests that defendant, before moving for summary judgment, undertook to raise a 12(b)(6) challenge to any portion of the complaint. *Vega v. First Fed. Sav. & L. Ass'n of Detroit,* 433 F.Supp. 624, 634–35 (E.D.Mich.1977).

*sua sponte* dismissals under Rule 12(b)(6)." *Neitzk v. Williams,* 490 U.S. 319, 329 n. 8, 109 S.Ct. 1827, 1834 n. 8, 104 L.Ed.2d 338 (1989). But the treatise-writers, and also the inferior courts, seem to be in substantial agreement that such authority exists: "Even if a party does not make a formal motion, the court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 at 301 (2d ed. 1990). "Dismissals under Rule 12(b)(6) are generally made upon the motion of the defendant, although the court may order dismissal on its own motion if process has been issued and served and plaintiff is given notice and an opportunity to respond." 2A James Wm. Moore, *Moore's Federal Practice* ¶ 12,07[2–5] at 12–99 (2d ed. 1995).[14] In this instance, as noted above, I invited the parties to provide guidance on the viability of plaintiff's amended complaint. The parties' submissions—both of which included balanced explications of section 10 and of the relevant case law—were helpful: They strengthened my doubts that plaintiff had presented cognizable federal claims.

Since it is apparent that I have authority, *mea sponte,* to dismiss a complaint which, I am convinced, fails to state a viable claim, the remaining question is whether dismissal is a prudent exercise of the court's discretion. An argument can be made—indeed, the argument is made by the parties—that, given the strong public interest in the settlement of cases, this court should, as Judge Robreno did in *Lake,* regard the vulnerability of plaintiff's case as an ingredient to be factored into the settlement calculus, not as a ground for dismissal. *Cf. Air Line Stewards v. Trans World Airlines,* 630 F.2d 1164 (7th Cir.1980). I would find the argument persuasive if I merely felt, as Judge Robreno did, that I would "probably" dismiss if confronted with a 12(b)(6) motion. But, given the accretion of section 10 case law—all of it adverse to plaintiff's position—since Judge Robreno decided *Lake,* what was only probable for Judge Robreno seems to me certain. I have no doubt that the Supreme Court, if it elected to address the question whether section 10 has by implication created a cause of action, would decide in the negative. And I have no doubt that if the Third Circuit is called on to address the issue before the Supreme Court has occasion to do so, the decision of that court would be in the negative. Under those circumstances, I think it would not be an appropriate exercise of my discretion to continue to devote the work-time of an Article III court to the supervision of a dispute that Congress has elected not to judicialize. The fact that such further supervision might expectably turn out to be non-onerous—in the sense that there is a fair likelihood that it would lead to approval of arrangements the parties have agreed to [15]—does not alter my view of the matter. Whether I were to approve or disapprove the proposed settlement, it would only be by devoting Article III time to matters which Congress has not seen fit to ask the federal courts to handle. And, if I were to approve the proposed settlement, I would, pursuant to the terms of the Settlement Agreement, "be expected to exercise continuing jurisdiction over the enforcement of the Settlement Agreement." Settlement Agreement and Release, ¶ 43. It could be fairly argued that an Article III judge lacks authority to volunteer the court's resources in a case which, the judge is convinced, should not be on the docket: That is to say, it may well be that an Article III judge is not authorized to furnish the trappings of Article III processes to matters Congress has put in other hands or left for

**14.** *See Wyatt v. City of Boston,* 35 F.3d 13, 14 (1st Cir.1994); *Smith v. Colorado Dept. of Corrections,* 23 F.3d 339, 340 (10th Cir.1994); *Gregory v. U.S./U.S. Bankruptcy Court,* 942 F.2d 1498, 1500–01 (10th Cir.1991), *cert. denied,* 504 U.S. 941, 112 S.Ct. 2276, 119 L.Ed.2d 202 (1992); *Local 267 v. Ohio Carpenters Health & Welfare Fund,* 926 F.2d 550, 557–58 (6th Cir.1991); *Baker v. Director, U.S. Parole Com'n,* 916 F.2d 725, 726–27 (D.C.Cir.1990); *Bryson v. Brand Insulations,* 621 F.2d 556, 559 (3d Cir.1980); *Erie City Retirees Ass'n v. City of Erie,* 838 F.Supp. 1048,

1050 (W.D.Pa.1993); *Coggins v. Carpenter,* 468 F.Supp. 270, 279 (E.D.Pa.1979).

**15.** The reason for supposing there to be a fair likelihood that I would find the Settlement Agreement entitled to preliminary approval, were I to reach the merits, is that Judge Robreno, in his characteristically perceptive assessment in *Lake* of a very similar settlement proposal, gave preliminary approval to that proposal.

private resolution.[16] In any event, assuming *arguendo* that I have authority to volunteer, I am persuaded that to do so would not be an appropriate exercise of discretion.[17]

Accordingly, in an accompanying order I will direct that plaintiff's motion for preliminary approval of the Settlement Agreement be denied and that the amended complaint be dismissed.

### ORDER

For the reasons given in the accompanying opinion, it is hereby ORDERED:

1. Plaintiff's motion for preliminary approval of the Settlement Agreement is DENIED;

2. Plaintiff's amended complaint is DISMISSED.

---

**16.** "It is Congress that determines the agenda of federal trial courts. In making that determination, Congress establishes priorities about the proper utilization of the energies of an institution of limited size and resources—the federal judicial system." *Serbin v. Ziebart Intern. Corp., Inc.,* 11 F.3d 1163, 1180 (3d Cir.1993). There are certain constitutional constraints on the exercise by Congress of its power over the jurisdiction and the architecture of the federal courts. Paul M. Bator, Daniel J. Meltzer, Paul J. Mishkin, David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 366–93 (3d ed.1988); Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 *Harv. L. Rev.* 1362 (1953). But those constraints are without application to the quite prosaic decisions Congress makes all the time (and of which the structure of RESPA is a good example) as to whether certain categories of disputes about compliance with statutory requirements should or should not be remitted to the federal courts.

**17.** My decision not to entertain this case does not, of course, signify that plaintiff's complaints about Meridian's escrow account practices are without merit. Whether Meridian's practices are proper or not is not for this court to say. If Meridian is persuaded that revision of its practices would be prudent—whether or not such revision is mandated by RESPA—the parties are presumably free to negotiate an agreement akin to the proposed settlement agreement without advance recourse to a federal court.